OPINION
Appellant/cross-appellee, Diane C. Snyder, and appellee/cross-appellant, Richard E. Snyder, appeal from a final judgment of the Geauga County Court of Common Pleas, Domestic Relations Division, granting the parties a divorce.[1] For the following reasons, we affirm the judgment of the trial court in part, reverse the judgment in part, and remand the matter for further proceedings consistent with this opinion.
Appellant and appellee were married on April 9, 1983 in Chester Township, Ohio. One child was born as issue of the marriage. On July 23, 1997, appellee filed a complaint for divorce. Appellant counterclaimed. Prior to trial, appellant and appellee entered into a shared parenting plan with respect to their minor daughter.
The contested divorce came on for trial on November 16, 1998 and November 17, 1998. Appellant and appellee were both represented by counsel. On April 29, 1999, the trial court filed extensive findings of fact and conclusions of law and issued its judgment dissolving the marriage and granting the parties a divorce on the basis of their incompatibility.
Appellant filed a timely notice of appeal from the trial court's entry of the divorce decree. Appellee subsequently filed a notice of cross appeal.[2] On January 20, 2000, we remanded the case to the trial court for a determination of any child support arrearage owed by appellee. The trial court complied with the order of this court and the case proceeded according to rule. Appellant now raises the following assignments of error for our review:
 "[1.] The trial court erred and abused its discretion by ordering the immediate sale of [the] marital residence, when neither party asked the court to order the sale of the property.
 "[2.] The trial court erred and abused its discretion by precluding the cross-examination of the Appellee on documents that were stipulated into evidence.
 "[3.] The trial court erred and abused its discretion in finding that the two oriental rugs were husband's separate property by way of inheritance, a gift and advance against his inheritance, and said finding is against the manifest weight of the evidence.
 "[4.] The trial court erred and abused its discretion in finding that the funds contained in Fidelity Account #T082489750 was husband's traceable separate property and said finding is against the manifest weight of the evidence.
 "[5.] The trial court erred and abused its discretion in finding that the funds contained in the rollover Fidelity IRA (Account No. T02292049) is husband's separate premarital property and said finding is against the manifest weight of the evidence.
 "[6.] The trial court erred and abused its discretion in failing to divide future royalties and/or other income from the patent held by husband, in that said patent was clearly demonstrated to be marital property.
 "[7.] The [trial] court erred and abused its discretion in dividing the marital property, in that said division is inequitable.
 "[8.] The trial court erred and abused its discretion in finding husband in contempt but without imposing a penalty for that contempt.
 "[9.] The trial court erred and abused its discretion in finding that Appellant was in contempt of this [sic] court's previous order and said finding is against the manifest weight of the evidence."
Appellee filed a brief responding to appellant's proposed errors. He also assigned the following as error on cross appeal:
 "[10.] The trial court made factual findings that are against the manifest weight of the evidence.
 "[11.] The trial court abused its discretion in holding that the Five Thousand Dollar ($5,000.00) diamond ring was Ms. Tuuri's separate property.
 "[12.] The trial court abused its discretion in holding that the entire equity in the marital residence was marital property."[3]
 I.
In her first assignment of error, appellant argues that the trial court abused its discretion by ordering the immediate sale of the marital residence at 8000 Woodsway Lane, Russell Township, Ohio, because neither she nor appellee requested such action. According to appellant, while the trial court has the equity power to determine issues such as alimony and property division, the court does not have the authority to order the sale of a piece of property when the sale is neither authorized by statute nor asked for by either party. We disagree.
Upon granting a divorce, the trial court is required to divide and distribute the marital estate between the parties in an equitable manner. Holcomb v. Holcomb (1989), 44 Ohio t.3d 128, 130. In doing so, the trial court is necessarily vested with wide discretion in formulating an equitable distribution of such property. Holcomb at 130. Berish v.Berish (1982), 69 Ohio St.2d 318, 319. As a result, the trial court's division of marital property will not be disturbed on appeal unless the court abused its discretion. Booth v. Booth (1989), 44 Ohio St.3d 142,144. An abuse of discretion connotes more than a mere error of law or judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
At trial, there was no dispute that the home at 8000 Woodsway Lane was, at least in large part, marital property. As a result, the trial court clearly had the authority to dispose of the home as a marital asset. Mekker v. Mekker (Dec. 23, 1999), Portage App. Nos. 98-P-0006, 98-P-0007, and 98-P-0100, unreported, at 16-17, 1999 Ohio App. LEXIS 6273. Moreover, contrary to appellant's position, there is no requirement that one or both of the parties must request that the marital residence be sold and the proceeds divided between the parties before the trial court can make such a disposition.[4]
Appellant is misguided in her reliance on our decision in Gills v.Gills (Dec. 23, 1994), Lake App. Nos. 93-L-191 and 93-L-194, unreported, 1994 Ohio App. LEXIS 5844, when arguing that the trial court abused its discretion in selling the home. In Gills, this court held that R.C.3105.171(J)(2) permits the trial court to issue any orders it deems equitable, including one requiring the sale of real property. We reversed the trial court's order of sale in Gills, however, because we concluded that under the unique facts of the case, the encumbrances on the property and the unpaid bills were relatively insignificant in relation to the overall assets of the parties.
That is not the situation confronting the parties in the case at bar. Accordingly, the trial court did not abuse its discretion in ordering the sale of the marital residence. Appellant's first assignment of error is without merit.
 II.
In assignment of error two, appellant contends that the trial court abused its discretion by limiting her attorney's cross-examination of appellee with respect to tracing appellee's claim of separate property. Appellant maintains that the trial court accepted most of appellee's testimony at face value in spite of the fact that she had "voluminous" documentation to demonstrate that appellee's testimony was self-serving and inaccurate.
While addressing this assignment of error, we are mindful that the scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest with the sound discretion of the trial court. O'Brien v. Angley (1980), 63 Ohio St.2d 159, 163; Peake v.Dieter (Dec. 23, 1994), Trumbull App. No. 93-T-4942, unreported, at 5, 1994 Ohio App. LEXIS 5945. Thus, the decision of the trial court to limit the scope of cross-examination will be reviewed for an abuse of discretion. O'Brien at 162; Peake at 5.
After reviewing the transcript, this court concludes that the trial court did not abuse its discretion in limiting appellant's cross-examination of appellee, particularly so because this was a trial to the court. First, it must be noted that appellant does not direct us to any particular question that the trial court did not permit appellee to answer. In fact, the record shows that the trial court allowed appellant's attorney to cross-examine appellee on a wide variety of financial matters. The only time the trial court interjected was when appellant's attorney asked appellee to read portions of several documents into the record. The trial court pointed out that the documents in question were already admitted without objection per stipulation of the parties and spoke for themselves. However, when appellant's counsel had a question concerning something contained in one of the documents, the trial court allowed the attorney to cross-examine appellee on those matters. Therefore, we fail to see how this hindered appellant from pursuing an effective cross-examination of appellee, or how her substantive rights were prejudiced.
As for the "voluminous" documentation to which appellant makes reference, the record shows that all exhibits submitted by appellant were admitted without objection pursuant to a joint stipulation of the parties. Presumably, the trial court read and considered these documents when reaching its final decision. Appellant's second assignment of error is without merit.
 III.
In her third assignment of error, appellant argues that the trial court's finding that the two oriental rugs were appellee's separate property was against the manifest weight of the evidence. According to appellant, appellee presented no competent, credible evidence that he had received the two rugs by inheritance, and as a result, the rugs should have been classified as marital property and subjected to an equitable division.
The trial court's characterization of property as either marital or separate necessarily involves a factual inquiry under a manifest weight standard. Barkley v. Barkley (1997), 119 Ohio App.3d 155, 159.
Marital property is defined in R.C. 3105.171(A)(3)(a) as including:
 "(i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
 "(ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
 "(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage."
Separate property, on the other hand, is defined by R.C.3105.171(A)(6)(a) to include:
 "(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;
 "(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
"* * *
 "(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse."
The burden of providing by clear and convincing evidence that after acquired property is separate under R.C. 3105.171 is upon the proponent of the claim. Peck v Peck (1994), 96 Ohio App.3d 731, 734; Frederick v.Frederick (Mar. 31, 2000), Portage App. No. 98-P-0071, unreported, at 17, 2000 Ohio App. LEXIS 1458.
The trial court found that the Kerman rug had been owned by appellee's mother and was subsequently received by appellee as a part of his mother's residuary bequest of tangible personal property in her will. As for the Bidjar rug, the trial court found that it had belonged to appellee's grandfather. The record showed that after appellee's grandfather was placed in the nursing home in 1993, his heirs met and divided his personal property. Appellee received the Bidjar rug as part of this division. Thus, the trial court characterized the Bidjar rug as both a gift from his grandfather and as an advance against appellee's eventual inheritance.
Appellant now argues that there was no clear and convincing evidence to support the trial court's findings, and that the rugs were actually gifts intended for both parties and not just appellee. She maintains that the testamentary documents, specifically the wills of appellee's mother and grandfather, entered into evidence were unauthenticated and, therefore, unreliable. Moreover, appellant contends that because the testimony of appellee and his brother was inconsistent, it should not have been relied upon by the court when making its decision.
Even if the testamentary documents were unauthenticated, the fact of the matter is that both appellee and his brother testified as to how the rugs came into appellee's possession. Their testimony, i.e., that the rugs were gifts given to appellee, was consistent. The testimony was also uncontradicted by appellant, who did not even mention the rugs in her trial testimony. We agree that the record does show that the parties expended marital funds in moving the rugs to their home, having the rugs appraised, and in installing hardwood floors in the marital residence to display the rugs. This, however, is not inconsistent with appellee's claim of a gift/bequest.
Accordingly, we conclude that there was clear and convincing evidence to support the trial court's findings. Appellant's third assignment of error is meritless.
 IV.
In her fourth assignment of error, appellant contends that the trial court's finding that Fidelity Account No. T082489750 was appellee's separate property was against the manifest weight of the evidence. According to appellant, the funds originated from the parties' joint checking account and are not traceable to an inheritance received by appellee.
This assignment involves proceeds received from the sale of the Bloomsburg property which appellee allegedly received from his grandfather shortly after the parties were married. It appears from the testimony that appellee's grandfather deeded his home to appellee sometime in 1984.[5] Appellee testified the home was worth $120,000 at that time. However, there was no evidence as to the amount of equity in the home or the remaining mortgage. After the "transfer," appellee paid the mortgage and taxes on the property while his grandfather paid rent in the amount of $700 per month to the parties.
When appellee took over the property in 1984, he did so in order for his grandparents to remain in the home. It was undisputed at trial that the rent did not cover the expenses of maintaining the home and that those expenses exceeding the rental income were paid from the parties' joint checking account. No breakdown of expense figures was submitted to the trial court.
When appellee's grandfather was placed in a nursing home in 1993, the parties refinanced the Bloomsburg property and secured a $150,000 new mortgage on the home.[6] No evidence was submitted as to the existing or resulting equity position that existed at that time. In addition to retiring the original mortgage of an unknown amount on the property, the funds were used to pay, in advance, the nursing home expenses for appellee's grandfather. Again, no figures regarding existing equity, sales expenses, or nursing home costs were submitted at trial. In 1994, the parties sold the Bloomsburg property for $200,000. These proceeds were used to pay off the remaining mortgage of an unknown amount on the home.
When appellee's grandfather died in 1996, the parties received a refund check for $131,558.89 from the nursing home. No accounting was submitted for this figure. This money was subsequently deposited into the parties' joint checking account. Shortly thereafter, appellee drew a check for $40,000 from the joint checking account and placed the money in Fidelity Account No. T082489750. In addition, appellee also wrote each of his brothers a check for the same amount. The remaining $11,558.59 was left in the joint checking account to allegedly reimburse the parties for their expenses relating to the upkeep of the Bloomsburg property prior to its sale.
The trial court concluded that the $40,000 placed in the Fidelity account was a traceable inheritance from appellee's grandfather, and as a result, was appellee's separate property.[7] The trial court's conclusion would make sense if the Bloomsburg property had been deeded to appellee and his two brothers by the grandfather prior to the marriage in 1983, and, if we knew what equity existed in the house at that time. However, there is no evidence of any transfer until 1984, clearly after the marriage; there is no gift tax return or other evidence of a gifting to appellee and/or his brothers; and, there is no evidence that the two brothers were ever placed on the deed.
Therefore, after reviewing the record, this court concludes that appellee failed in his burden to establish the separate nature of the $40,000 by clear and convincing evidence. Appellee's own testimony was that he and his brothers took over the house because they expected to inherit the house and did not want to lose it because the grandfather could no longer afford the expense of its upkeep. Presumably, then, appellee intended to hold the deed in a constructive trust for himself and his two brothers. That explanation, however, is not evidence of a gift or inheritance. Furthermore, as we noted earlier, there is no record or accounting of the original equity or of the sale proceeds of the property; there is no breakdown of the nursing home costs; and, there is also no record of the additional expenses paid by appellee and appellant in maintaining the house from 1984 to 1994.
If the home were given to appellee after the parties were married, the existing equity in the home presumably would be non-marital property. However, any appreciation would, at least in part, be marital because it is undisputed that marital funds were used to pay the expenses in excess of the $700 rental payment. On appeal, appellee now appears, to be claiming that the Bloomsburg property was purchased in 1984 with his own premarital funds, thus, entitling him to the later sale proceeds. Nevertheless, there is nothing in the record to document the source of any premarital funds allegedly used to assume the mortgage in 1984. As previously mentioned, there is a complete lack of evidence as to the nature of the 1984 transfer; there is no documentation of the subsequent refinancing and later sale of the property, or the later funding of the nursing home. Thus, the source of the resulting refund was untraceable. Appellee failed in his burden of proof. The $131,558.89 received from the nursing home had become inextricably co-mingled with the parties' marital funds.
Even if we presume that two-thirds of the unknown purchase price in 1984 either came from or was gifted to appellant's brothers, the trial court could not find that the remaining $40,000 represented either appellee's premarital share of the $131,558.89, or his inheritance from his grandfather. Simply put, at his death, the grandfather no longer had a home to bequeath because he transferred it in 1984. Moreover, there is no record of what, if any, appreciation accrued; whether it was active or passive; what contributions were made by appellee's brothers; and, whether the rent paid by the grandfather after the marriage was non-marital in nature, etc. Again, it was appellee's burden to provide clear and convincing evidence on these issues, which he failed to do. Therefore, the resulting $131,558.89 was transmuted because its source was untraceable. Appellant's fourth assignment of error has merit.
 V.
In assignment of error five, appellant maintains the trial court's finding that the funds contained in Fidelity IRA Account No. T02292049 were appellee's separate property was against the manifest weight of the evidence. According to appellant, the initial deposit in that account, and several subsequent deposits, were made during the marriage. Therefore, appellant argues that the funds were marital property.
The record shows that prior to the marriage, appellee began working at Goble Associates as an engineer. As part of his employment, appellee participated in a profit sharing plan through Pile Dynamics, Inc., a subsidiary of Goble Associates. Despite the fact that appellee began working for Goble Associates in 1978, the company did not make a contribution to the profit sharing plan until after the parties were married. In 1989, appellee received a distribution from the plan and immediately rolled over this money into the Fidelity account at issue.
In disposing of this account, the trial court concluded that the initial funds deposited in the profit sharing plan were for work performed before the date of the marriage. As a result, the court determined that because no other contributions were made to the plan after the initial deposit, the 1989 distribution represented a premarital asset that had increased in value through passive appreciation.
After reviewing the record, this court concludes that the trial court's findings were not against the manifest weight of the evidence. While the initial deposit was made after the marriage, there was evidence that the funds were actually earned prior to the marriage. This constitutes separate property. R.C. 3105.171(A)(6)(ii). See, also, Demo v. Demo
(1995), 101 Ohio App.3d 383, 387 ("[s]ince appellee earned the award prior to the marriage and there was no commingling with marital property, the trial court did not abuse its discretion in determining that the stock option was appellee's separate property"). Furthermore, there is nothing in the record suggesting that additional contributions were made on appellee's behalf during the life of the marriage. Appellant's fifth assignment of error has no merit.
 VI.
In her sixth assignment of error, appellant argues that the trial court abused its discretion in failing to divide any future royalties generated by a patent from which appellee received payments.
The record shows that the patent in question is owned by Bridge Weighing Systems, Inc. ("BWS"), a company in which appellee is the sole shareholder. It is undisputed that appellee and the other individuals who were involved in the development of the patent sold the rights to BWS. As part of the agreement, appellee was entitled to a percentage of future royalties generated by the patent. No evidence was introduced as to the value of the patent itself. Nevertheless, the record shows that the trial court included the royalties that appellee received from the patent in 1997 as part of his income.
In evaluating BWS, the trial court concluded that the company was marital property. In doing so, the court stated:
 "96. Bridge Weighing Systems, Inc., is marital property, having a fair market value of $43,372.00, including the U.S. Patent Number 5,111,897 patent and any royalties it has or may produce." (Emphasis added.)
In the trial court's disposition of marital property, the court awarded appellee sole ownership of BWS. Thus, the trial court's award of BWS to appellee clearly includes the royalties generated by the patent. In fact, the trial court treated the royalty payments as income rather than separate or marital property. Without evidence as to the value of the royalties, the trial court could do little else. As a result, appellant's sixth assignment of error is without merit.
 VII.
In assignment of error seven, appellant argues that the trial court abused its discretion in dividing the marital property because, although the division is equal on its face, the division was inequitable in application. Appellant believes that based on the facts and circumstances of the case, she should be entitled to a distributive award from appellee's separate property.
As we noted earlier, the division of marital property is generally required to be equal between the parties. R.C. 3105.171(C)(1). However, if an equal distribution would be inequitable, the trial court has the authority to divide the marital property in a manner that the court deems equitable. Id. Furthermore, in order to achieve an equitable result, the court may make a distributive award from the other spouse's separate property. R.C. 3105.171(E)(1).
According to appellant, she was awarded only $5,000 in separate property, while appellee was awarded $143,304.48. Thus, appellant believes that she should have been compensated for the marital funds expended on the Bloomsburg property and the oriental rugs, in addition to several loans that she claims were made to BWS while the couple was married.
We disagree in part. As discussed in appellant's fourth assignment of error, we agree that the division of the Bloomsburg property needs to be revisited. Moreover, with respect to the oriental rugs, appellant made no claim that she did not agree to the remodeling.
As for the loans to BWS, the trial court found that the parties had made several loans to the company from their joint checking account. However, the court also noted that appellee testified that he had written promissory notes for all loans made to the company, and that each loan was paid back in full. No other proof, documentary or otherwise, was offered to support appellant's theory that appellee did not pay back the loans made with marital funds.
Based on the trial court's findings, we conclude that, except for the Bloomsburg property, the trial court did not abuse its discretion in dividing the marital property equally between the parties. There is no evidence implying that the court was unreasonable, arbitrary, or unconscionable in reaching its final disposition. It must be remembered that the trial court is vested with wide discretion in formulating an equitable distribution, and this court will not disturb that distribution absent an abuse of discretion. After reviewing the record, we are satisfied that the trial court met its burden under R.C. 3105.171 when it divided the marital assets as it did. Appellant's seventh assignment of error is without merit except as noted.
 VIII IX.
In assignment of error eight, appellant claims that the trial court erred by not penalizing appellee after he was found in contempt for violating a court order. In assignment of error nine, appellant maintains that the trial court's finding that she was in contempt for violating an order of the court was against the manifest weight of the evidence. Because these assignments present related issues, they will be considered in a consolidated fashion.
Due to the nature of contempt proceedings, a trial court has broad discretion in these matters. Burke v. Burke (May 14, 1999), Geauga App. No. 98-G-2163, unreported, at 2, 1999 WL 315399. Therefore, a trial court's finding of contempt will not be disturbed absent an abuse of discretion. Burke at 2.
In the case at bar, the trial court found, and appellee did not deny, that appellee had violated the court's order restraining him from entering the marital home during the divorce proceedings. However, the court also found that appellant had violated an order of the court by withdrawing funds from a marital account. Appellant, nevertheless, defended her actions by arguing that she needed to pay the parties' estimated income tax but that appellee was out of the country and could not be reached.
Appellant offered no reason as to why she did not petition the court for permission to make the withdrawal. Based on appellant's admission that she withdrew the funds then, we cannot say that the trial court abused its discretion in finding her in contempt. Moreover, the trial court's refusal to order appellee to pay appellant's attorney fees is also not an abuse of discretion. It is apparent from the trial court's ruling that the court believed it was unnecessary to order the parties to pay the other's fees because both parties were guilty of contempt. Appellant's eighth and ninth assignments of error are without merit.
 X.
In his first assignment of error on cross appeal, appellee argues that several of the trial court's findings of fact are against the manifest weight of the evidence. In disposing of this assignment, we will take each claim in turn.
First, appellant argues that when dividing the marital property, the trial court mistakenly omitted appellant's Fidelity Account No. T0236515, which was valued at $13,902.27, from its order. A review of the record shows that the trial court listed this particular account in its findings of fact. However, there is no mention of the account in the trial court's divorce decree. Appellee posits that he may be partially at fault because he inadvertently failed to include the account in his proposed conclusions of law.
There is no dispute that appellant acquired the account during the marriage. Therefore, it was marital property and should have been disposed of with the other marital assets. On remand, the trial court is instructed to adjust its judgment accordingly, including any other calculations which this revision may, in fairness, require.
Next, appellee claims that the trial court erred in valuing BWS. While appellee does not question the authority of the court to utilize a tax return when valuing a business, especially in the absence of an appraisal, appellee believes that the trial court mistakenly characterized a liability as an asset when making its determination.
Neither party offered testimony, expert or otherwise, with respect to the value of BWS, or with respect to the significance or proper interpretation of the various items included in the tax returns. However, the parties did submit arguments in their final briefs to the trial court on this issue. Appellant argued that BWS' value should be based on the company's retained earnings plus stock accounts, for a total of $43,372. On the other hand, appellee urged the trial court to base the company's value strictly on the value of its inventory, or $6,591.
On appeal, appellee now changes his approach and argues that the trial court's value of BWS should be adjusted to $24,172. Appellee reaches this figure by adding the value of the capital stock to the company's retained earnings, $33,772, and then subtracting the value assigned to the treasury stock in the tax returns from this total.
The trial court agreed with appellant at trial and took the value of the capital stock, $15,200, and added it to the companies' retained earnings of $18,572. The trial court then added in the value of the treasury stock, $9,600, held by BWS. This resulted in a total value of $43,372.
Based on our review of the record, we cannot say that the trial court abused its discretion in its calculations. Appellee offers no authority to support his valuation method regarding treasury stock. At trial, he provided no definition, testimony, or argumentation regarding the significance of the treasury stock and how it should be treated. Moreover, he never presented the trial court with the proposed calculation or valuation he now submits. We decline to now take judicial notice of a fact which was not drawn to the attention of the trial court.
If appellee wanted the trial court to value BWS differently, he was obligated to present relevant testimony and evidence in support of his proposed result. Having failed to do so, appellee cannot now argue that the trial court acted improperly. Even if the trial court improperly factored the treasury stock, we will not take judicial notice of the treasury stock because appellee has waived any such error by failing to address the issue with the trial court. Minor v. Northrop (Nov. 19, 1999), Portage App. No. 97-P-0120, unreported, at 1, 1999 WL 1080830. Therefore, this court concludes that the trial court's decision as to how to value BWS was not an abuse of discretion.
Appellee next argues that the trial court erred in finding that BWS was a marital asset in its entirety. A brief history of BWS and appellee's relationship with the company is important for our analysis. Appellee began working at BWS in 1980. In 1983, appellee acquired six shares of BWS stock at a cost of one hundred dollars per share. This transaction occurred prior to the parties' marriage later that same year. In 1988, appellee purchased fifty more shares of BWS stock, giving him a majority ownership interest in the company. By 1989, BWS had reacquired all of the outstanding shares of the four original shareholders, leaving appellee as the sole shareholder. No evidence was submitted that the funds used to purchase the postmarital shares came from anything other than marital funds.
As we noted earlier, the trial court concluded that BWS was a marital asset subject to an equitable distribution. Appellee, however, takes issue with this conclusion. In doing so, appellee argues that the trial court failed to consider the six shares of BWS stock that he had purchased prior to the marriage.
During the proceedings conducted in the trial court, appellee argued that the six original shares were his separate property. The record shows that he purchased the shares approximately one month prior to the couple's marriage. There was no evidence to the contrary. As a result, those shares should have been distributed to appellee as separate property. On remand, the trial court is instructed to enter a finding that the six original shares were appellee's separate property. We note that there was no evidence that any subsequent appreciation of the six shares of stock was due to anything other than appellee's efforts during the marriage. Hence, any appreciation was marital in nature, and appellee is due $600.
In his final argument under this assignment, appellee contends that the trial court erred in finding that loans were made to BWS from marital funds. Appellee acknowledges that he wrote various checks from marital accounts to BWS over the years. However, as he correctly points out, there is no evidence that each of these checks represented a loan. In fact, the only loans to which any evidence was introduced concerned the two promissory notes.
In any event, the trial court's finding that appellee had made several loans to BWS from marital funds apparently had no bearing on the trial court's determination that BWS was marital property. Appellee, nevertheless, maintains that such finding could prejudice him in a subsequent redistribution of property. Because that has yet to occur, we decline to address the issue at this time.
Appellant's first assignment of error on cross appeal has merit to the limited extent indicated.
 XI.
In his second assignment of error on cross appeal, appellee claims the trial court's finding that the diamond ring given to him by his mother was the separate property of appellant was against the manifest weight of the evidence. We agree.
The following facts are undisputed. Appellee received the ring in question from his mother's estate. In turn, the parties had the stone reset so that appellant could wear it. Appellee, however, argues that although they did have the ring reset and appellant was allowed to wear the ring, he never intended to give the diamond to his wife as a gift.
Generally, when a party receives an item by inheritance, that item remains the separate property of the inheriting spouse. R.C.3105.171(A)(6)(a)(1). Nevertheless, a spouse can change separate property into marital property through his or her actions during the course of the marriage. Helton v. Helton (1996), 114 Ohio App.3d 683,685. One way of effectuating such a transformation of separate property into marital property is through an inter vivos gift. Barkley at 160;Helton at 685. An inter vivos gift occurs when the donor executes "an immediate voluntary, gratuitous and irrevocable transfer of property" to the donee. Smith v. Shafer (1993), 89 Ohio App.3d 181, 183.
The essential elements of an inter vivos gift are: (1) the intent of the donor to make an immediate gift; (2) the delivery of the property to the donee; and (3) the acceptance of the gift by the donee after the donor has relinquished control of the property. George v. Zink (May 23, 1997), Lake App. No. 96-L-132, unreported, 1997 Ohio App. LEXIS 2234. If any of these elements are not satisfied the gift as a whole fails.George at 4-5.
The donee bears the burden of proving by clear and convincing evidence that the donor made an inter vivos gift. In re Estate of Fife (1956),164 Ohio St. 449, 456. In the context of a divorce, in order to have the donor spouse's otherwise separate property classified as a martial asset, the donee spouse must demonstrate by clear and convincing evidence the gift of real or personal property which was otherwise separate property. Helton at 686-687.
The trial court found that the ring was appellant's separate property because appellee had given his mother's diamond ring to appellant during the marriage. After reviewing the record, we conclude that this finding was against the manifest weight of the evidence. Appellant had the burden of proving all three elements of an inter vivos gift by clear and convincing evidence. However, despite her claim, appellant presented no real evidence with respect to appellee's intent during the proceedings below. In fact, the only evidence relating to intent was appellee's testimony and a receipt representing the cost of the resetting. Appellee clearly stated that he never intended to permanently give appellant the ring. This testimony went uncontroverted by appellant. Thus, although it was clear that the ring had been reset so that appellant could wear it, there is absolutely no evidence showing that appellee intended to give appellant the ring. Because she failed to meet her burden to provide clear and convincing evidence as to the first element of a valid intervivos gift, there is no need to consider the remaining criteria. Appellee's second assignment of error on cross appeal has merit.
 XI.
In his third and final assignment of error on cross appeal, appellee maintains that the trial court's finding that the entire equity in the marital residence was marital property was error. According to appellee, at least a portion of his premarital down payment from his condominium was used to purchase the property at 8000 Woodsway Lane and should have been credited to him as separate property.
The following facts are relevant with respect to how the parties came to purchase and reside in the home at 8000 Woodsway Lane. Immediately prior to the parties' marriage in 1983, appellee purchased a condominium for $64,700 for which he paid $13,883.50 as a down payment.[8] After the couple was married, the parties lived in the condominium until 1985. During these two years, the mortgage on the condominium decreased from $51,700 to $49,299.35 for a total of $2,400.65. This reduction was due to the contribution of both parties.
The parties sold the condominium in 1985 for $65,000. After the payment of real estate commissions, closing costs, and other expenses, the sale resulted in net proceeds of $10,090.50. This money was immediately wired to the bank handling the purchase of the marital residence to be used in conjunction with marital funds as a down payment on the parties' new home.
The trial court found that because the condominium was sold at a loss, appellee's premarital contribution to the condominium was lost as the "result of a bad investment." While not expressly doing so, it is apparent that the trial court classified the $10,090.50 that was received from the sale of the condominium as marital property instead of apportioning some of that amount as appellee's separate property. Thus, the trial court treated the home at 8000 Woodsway Lane entirely as a marital asset subject to division and distribution.
Therefore, the question presented by appellee's third assignment of error on cross appeal is whether the home constituted marital property, separate property, or a combination of both. Because appellee is claiming that he should be credited with at least a portion of the down payment as separate property, he had the burden of proof on this issue.
After considering the record, we conclude that appellant satisfied his burden of proving that a portion of the value at 8000 Woodsway Lane was his separate property. The trial court failed to recognize that at least a portion of the proceeds from the sale of the condominium originated from the down payment. Although there was an overall loss on the sale, the parties did realize some net gain which was subsequently used to purchase the marital residence. "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). As a result, the trial court should have determined how much of the $10,090.50 was attributable to appellee's initial investment.[9]
Based on our review, the characterization of 8000 Woodsway Lane as entirely marital property was contrary to the manifest weight of the evidence. Appellee's third assignment of error on cross appeal has merit.
As a result of the foregoing analysis, appellant's fourth assignment of error has merit. Appellant's seventh assignment of error is well-taken to the limited extent indicated. In addition, appellee's first, second, and third assignments of error on cross appeal are also well-taken to the extent indicated. Accordingly, the judgment of the trial court is affirmed in part, reversed in part, and the matter is hereby remanded for further proceedings consistent with this opinion. Specifically, the trial court is ordered
to make any adjustments in the property distribution the court deems necessary to reflect our judgment and opinion.
 _____________________________ JUDITH A. CHRISTLEY, JUDGE
FORD, P.J., NADER, J., concur.
[1] For the sake of clarity, we will refer to the parties as "appellant" and "appellee" even in the context of the cross appeal.
[2] The judgment of the trial court was stayed pending the outcome of this appeal.
[3] Appellee's assignments on cross appeal have been renumbered to correspond sequentially to the assignments raised by appellant in her appeal.
[4] We would like to note that appellee did suggest in his post-trial brief that the trial court sell the marital residence as an alternative proposal.
[5] There was no indication that this deed was ever recorded, or that the mortgage was officially assigned to appellee.
[6] Presumably, the deed was finally recorded with this new mortgage so that appellant and appellee became directly liable on the mortgage.
[7] There was no explanation as to why the brothers were each entitled to receive $40,000. However, that issue was not raised or disputed on appeal.
[8] Apparently, the figure of $13,883.50 included closing costs of $883.50 and a downpayment of $13,000.
[9] Our calculations show that appellee's $13,000 down payment was 20 percent of the $64,700 purchase price. In turn, 20 percent of $10,090.50 is approximately $2,018. Accordingly, appellee should have been credited with at least $2,018 of the $10,090.50 as his separate property.